# DUVAL COUNTY SCHOOL BOARD v DAVIS

## Case No. 87-2212

State of Florida, Division of Administrative Hearings

January 27, 1988

### APPEARANCES OF COUNSEL

**James L. Harrison, Steven E. Rohan, Gail A. Stafford,** Office of the General Counsel, for petitioner.

**Lamar Winegeart, III, Mahoney, Adams, Milam, Surface & Grimsley P.A.,** for respondent.

### OPINION OF THE COURT

ROBERT T. BENTON, II, Hearing Officer.

### *RECOMMENDED ORDER*

This matter came on for hearing in Jacksonville, Florida, before Robert T. Benton, II, Hearing Officer of the Division of Administrative Hearings, on September 17, 1987, and finished the following day. The Division of Administrative Hearings received the hearing transcripts on October 15, 1987, having earlier, in keeping with counsel's stipulation

at hearing, received deposition transcripts of Agnes Carlyle's, Thomas W. Heard's and Thomas Nathan Tawes's testimony.

Duval County School Board's proposed hearing officer's recommended order reached the Division of Administrative Hearings on October 28, 1987, and respondent's proposed findings of fact and conclusions of law arrived the following day. The parties waived rulings on each proposed finding of fact by number.

After the Superintendent nominated him for continued employment as General Director of Security for the 1987-1988 fiscal year, Respondent learned of the School Board's vote to reject the Superintendent's nomination by letter dated April 28, 1987. An attachment to the letter alleged as claimed "good cause, pursuant to 230.23(5), Florida Statutes," that Mr. Davis "[f]ailed to keep sufficient records to properly administer [the school board's security] department . . . [including] proper service records'; "failed to provide . . . a timely [and accurate] report on 1986 losses'; "failed to provide a working environment in the security division in which productive results could be expected," specifically in preventing Linda Hancock "from doing her job for a continuous period of more than one year," in "knowingly waste[ing] the productive capacity of employees . . . [including] James Heard," in "conduct[ing] his duties using verbal profanity and interpersonal abuse," in "fail[ing] to fill vacancies in the security department in a timely and effective manner," in "arbitrarily transfer [ing] officers without hearings or due process," to wit, "Tom Tawes and Bob Dickinson without notification of complaint," and in "fail[ing] to provide or request an employee within the security department with technical expertise in burglar and fire alarm systems"; that he "failed . . . to provide proper repair service for the burglar alarm systems in the schools and . . . failed to exercise effective control of a vendor working for the security department'; that he "accepted and authorized payment for building security systems which were not complete and . . . did not fulfill . . . [contract] requirements'; and that he "knowingly authorized payment for services he did not receive from Sonitrol of Jacksonville."

## ISSUES

Whether the School Board was bound to renew respondent's contract, once the Superintendent nominated him to continue as General Director of Security? If not, whether good cause exists to reject the nomination?

## FINDINGS OF FACT

The Duval County School Board's security office is responsible for

228

coordinating and maintaining an incident reporting records system, collecting and cross-checking school employees' criminal records, conducting various internal investigations and for "coordination and monitoring of the security alarm systems . . . " Respondent's Exhibit No. 5, p. 13

An associate superintendent of personnel for the Duval County School Board, before he became superintendent in 1976, Herb A. Sang had hired James W. Heard to head up the Board's security operations.

Eleven years later, Superintendent Sang learned that law enforcement officers who worked under Mr. Heard's supervision (although they were furnished to the School Board under an agreement between the BOard and the Sheriff's Office) were using School Board cars "moonlighting . . . for stores like May Cohens." (T. 200-201) On this account, and because of "concerns about theft inside," (T. 201) Mr. Sang decided to create a new position to oversee security for the School Board. Mr. Heard enjoyed civil service protection, and stayed on.

When respondent Richard M. Davis became the first person to hold the new position, he was known as general director of security and Mr. Heard began reporting to him. Mr. Davis had gone to work for the F.B.I. upon graduation from law school, and only left to take the job with the Duval County School Board, where he began on December 28, 1984. Continuously since 1970, he had had supervisory duties.

As the School Board's General Director of Security, he supervised, in addition to Mr. Heard, three clerical employees, Linda Hancock, Lorraine Hampton and Agnes Carlyle; and several investigators, including Robert Dickinson, Jack Adams, Thomas Tawes, Messrs. Poston, Hogan, Harrington, Dixon, and Miller.

## SONITROL

Soon after respondent Davis began work with the School Board, he relieved James W. Heard of responsibility for overseeing Sonitrol's installation of security systems. He took on this responsibility himself, although he shared the duties with Jack Adams until school reopened in the fall of 1985. Mr. Davis never discussed "the problems of the Sonitrol system," Heard deposition, p. 75, with Mr. Heard. He never asked Mr. Heard's advice, and Mr. Heard volunteered none.

When Mr. Davis began as general director of security, Sonitrol of Jacksonville, Inc. (Sonitrol) had already installed 81 or 82 alarm systems in 73 of the some 140 schools the Duval County School Board operates, in accordance with a contract entered into, perhaps in 1982. Heard deposition, p. 52. In early 1985, another system was installed at

another school. On April 15, 1985, the School Board approved installation of 71 more Sonitrol alarm systems. In separate action the same month, the Board approved installation of two other systems for a total of 73 systems for 66 sites.

At the schools selected, systems were installed to monitor the school office, the computer room, other places where "high dollar items are" (T. I. 132) and "major entries," *id.,* but many classroom went unmonitored in order to keep costs down. Installation of such a system entails attaching metal plates or "door contacts" on doors opposite like plates on jambs. Wires are then run so that, when current is supplied, opening the door breaks an electrical circuit, which "registers in the control panel that's in the school . . . [which panel] transmits that information in code form over a telephone line to . . . [the] central monitoring station . . ." (T. II. 153, 154)

In addition, up to 15 "preamps," audio sensors known loosely as microphones, can be wired to each central panel so that sound is also transmitted to the central monitoring station, if the noise level rises above a certain level. How best to use a limited number of preamps varies from building to building, depending on, among other things, where noise-generating equipment is located. Once they are in place, the system is calibrated to avoid transmissions of routine, background or "ambient" noise, sounds emanating from water coolers, fluorescent lights, cooling and heating systems and other "internal" sources.

Anybody with the access number can turn the alarm system on and off. Systems ordinarily remain off during the school day. Once their work is completed, the custodial staff turn them on for the night. At least at night, a school board employee monitors a video display terminal on which "PE" indicates that a "perimeter entry" has been effected, i.e., that a door has opened. When sound picked up by an audio sensor is transmitted to the central monitoring station, "AU" appears on the screen while the sound is reproduced on a loudspeaker. Next to "PE" or "AU" appears a number corresponding to the school or other facility at which opening a door broke a circuit or from which sound is transmitted.

The audio transmissions are recorded and can be replayed by the monitor who must decide whether something is amiss. Computerized storage equipment creates a permanent record on magnetic tape of all "occurrences . . . any time there is an activation audible or perimeter entry or code . . . when someone comes in the school, when someone leaves the school, or the telephone line falters and the system redials, whatever transpires out there . . ." (T. II, 160)

230

Under its agreement with the School Board, Sonitrol was to furnish school board personnel a detailed, written plan for each school involved, and, once the security chief approved the plan, to install the system. Installation has three phases:

(1) Physical Installation — This is complete when the school has been wired, and the control unit, microphones and door contacts installed.

(2) On-Line — This is complete when the Contractor has "powered the system up" and performed tests on the microphones.

(3) Operational — This is complete when access numbers have been issued and the systems are monitored by the central monitoring board at the administration building. Petitioner's Exhibit No. 10, p. 2.

Under the Board's agreement with Sonitrol, Sonitrol undertook "[e]quipment installation, testing and training within ninety (90) days after receipt of purchase order," Petitioner's Exhibit No. 10, p. 4, but witnesses testified that, after physical installation was accomplished, and the contractor had tested the system, it was the School Board, not Sonitrol, who was "to go out and train the operators, deliver the code cards." (T. I. 157) Although programmed and "on line," a system might not be operational if, for example, "conduit . . . has not been installed . . ." (T. II. 168) The School Board was responsible for installation of a sufficient number of telephone jacks.

Sonitrol agreed to maintain the systems for a monthly fee "for twelve (12) months from date of completion of installation and operating condition (including training and testing)." Petitioner's Exhibit No. 10, p. 2. The agreement called for preventive maintenance at least quarterly, and specified that "system failure due to normal wear or telephone failure is covered under your service contract." Petitioner's Exhibit No. 10, p. 4. Prior to January 1987, the School Board did not keep records of what preventive maintenance Sonitrol performed.

When Mr. Heard oversaw Sonitrol's installation of alarm systems, he and the principal or head custodian of the school involved

would walk the school to see if the equipment was in and installed as it was supposed to be, that it was all there; and we would test it for them. When Mr. Gallagher called me and said, "We've got school number so-and-so on-line. We're going to test it for a week," they would before we actually put it on-line.

And we would test it down in the monitoring room, and then they'd fine tune it and get the noisy areas out and so forth. And at the end

of a week or ten days, it would be on-line at that point, then we started playing for maintenance . . .

. . . they put it on-line, and we'd monitor it. They'd have people down there during the night and listen to it. And if there was a noise problem with it, then they'd do what they called fine-tune it.

They'd go out there and try to locate what the noise was. They might have to relocate a mike a little further away from the heater or something of this nature . . . Heard deposition, pp. 56, 57

Before December of 1984, Mr. Heard told the clerical staff "whenever a school was put on-line." Carlyle deposition, p. 47.

In some instances Sonitrol began billing for maintenance for systems even before they were operational. As far as the evidence showed, those systems were "on-line" before billing for their maintenance began and, in fact, required maintenance. If te monitor learned of a problem with a system after it had become operational, she notified Sonitrol and made an entry in a log book to that effect. Sonitrol made a monthly report of maintenance it performed.

After Mr. Davis became General Director of Security, significant delays attended the transition from "on-line" status to "operational" status. Charges incurred for maintenance of systems before they become operational aggregated more than $13,000 for the period between September 1, 1985 and March 31, 1987. Especially without the contract in evidence, however, the proof does not establish that they moneys constituted an overpayment to Sonitrol for maintenance.

But, even if these moneys were not overpayments to Sonitrol, they nevertheless may be said to represent part of the cost of the delays in rendering systems operational after Sonitrol had completed its work in installing them. The School Board also lost the protection operable alarm systems would have afforded after they physical installation but before they became operational, although the evidence established no burglary losses attributable to the delays. As General Director of Security, it was respondent Davis' responsibility to see that "on line" systems became operational as promptly as practical. In December of 1986, Mr. Davis left off overseeing installations personally and turned this task back over to Mr. Heard. At that time, 40 some systems were "ready to be completed and ready to go on line that needed to be put on-line." Heard deposition, p. 62. Of these, "about 16 or 17 . . . were ready . . . had things to be done to them before they could be put on-line." *Id.*

Seven or eight systems had been installed, a least partially, for 18 months or longer but were not operational. Forest and Paxon high

232

schools each lacked a phone jack that was needed and "there was some conduit that had to be run on one of the systems in order to complete the installation of it." (T. 53) The system at Normandy Village Elementary School had been in place since May of 1986, but had been struck by lightning, and needed to be reprogrammed in December of 1986, when Mr. Heard inspected. The systems at Stillwell Junior High School also needed to be reprogrammed. As far as the evidence shows, no burglaries occurred at any of these seven or eight schools while their systems were not operational.

The School Board paid invoices aggregating $470 "for phone line problems, replacing batteries, . . . [and] for service calls when no problems were found." Petitioner's Exhibit No. 10, p. 4. Whether these charges were proper under the contract between Sonitrol and the School Board is not clear from the evidence. The contract was not offered in evidence, although excerpts are quoted in Petitioner's Exhibit No. 10.

Sonitrol sometimes received payment for equipment before it was installed. In these instances, the School Board lost the use of various sums for varying periods. The evidence does not establish what these sums or how long these time periods were.

## A NEW BOSS

When he first began, Mr. Davis called a meeting with the investigators in which he told them that Mr. Heard would continue to supervise them and that nothing would change, in that regard. This was the last meeting in which all the investigators were invited to participate.

Ms. Hancock, who had worked for Mr. Heard for ten years, had grown used to the way Mr. Heard did things and felt very loyal to him. She was upset to an extent, when Mr. Davis took charge of the security staff, although she became his secretary. She was also offended at his apparent lack of confidence in her, and chagrined that he sent work to typists elsewhere in the building. She believed these typists avoided her, because he did.

Heated arguments between Mr. Davis and Messrs. Dickinson and Tawes proved distracting, and Ms. Hancock took umbrage at some of Mr. Davis' profanity, although his language improved over time. (T. 45) On two or more occasions, Mr. Davis yelled at someone in the office in the presence of other employees. Heard deposition, p. 40.

He "hollered" at Mr. Dixon after discovering that the latter failed to apprise him of a teacher's arrest. Once Mr. Davis came to the investigators' office door

and started yelling, "Goddamn you son of a bitches. If you aren't happy here, transfer your asses out of here." He was just ranting and raving. Tawes deposition, p. 27.

Once he upset Ms. Hampton by shaking a telephone message "in front of . . . [her] face," Carlyle deposition, p. 33, rebuking her, although without raising his voice, in the presence of others, for failing to take down a caller's telephone number.

### SHOP TALK

At least until December of 1986, Respondent Davis daily employed "all of the normal vulgarity typed words" (T. 61) including "fuck quite regularly, God damn" (T. 60) and "son of a bitch." *Id.* Ms. Hancock does not believe in taking "the Lord's name in vain" (T. 41) and does not think "fucking, any of those type words . . . should be said around a lady." (T. 42) Mr. Davis' language also displeased Ms. Carlyle and Ms. Hampton, Carlyle deposition; Heard deposition, p. 17, but nobody ever spoke to Mr. Davis about it, as far as the record shows. He did not actually swear at the clerical staff, as far as the evidence shows.

### PERSONNEL CHANGES

After working for Mr. Davis for more than two years, Ms. Hancock applied for a transfer in February of 1987. He first learned of her intention to leave when she told him she had secured another position. At no time did Ms. Hancock ever voice any complaint to Mr. Davis about working conditions.

When Mr. Davis started, the security department had two vacancies. One had existed for about a decade, and the other for more than a year before Mr. Davis began, having arisen when an investigator retired. Both remained unfilled at the time the present charges were made. The perennially vacant position was kept on the books at the direction of senior administrators as a means of enhancing the department's budget.

Robert C. Dickinson, a law enforcement officer, had been "assigned to School Board security" (T. 59) for six years when Mr. Davis began working there. He, too, stayed on another two years, but he did not leave voluntarily. Sheriff McMillan transferred him to patrol duty in response to Mr. Davis' request made both by telephone and in writing on December 17, 1986, that he do so. In his letter of that date to the sheriff, Mr. Davis explained the basis for the request:

On December 15, I proceeded to the public parking lot at the intersection of Southside Boulevard and Baymeadows Road, where I parked in order to observe the entrance to the Jacksonville Country

234

Day School. At approximately 7:52 a.m., I observed Detective Dickinson, stopped southbound on Southside Boulevard, at the traffic light. He had a passenger in the right front seat that I must presume was his daughter, whom I have heard him says attends Jacksonville Country Day School. He made a left turn into the school grounds. At about 7:54 a.m., he exited the school driveway, turning north onto Southside Boulevard.

Again, on December 16, 1986, I waited in the same location. At 8:01 a.m., I observed Detective Dickinson turning into the school grounds from Southside Boulevard, again with the same young female passenger. He exited the school driveway at 8:03 a.m., again turning north on Southside Boulevard. On both days I observed Detective Dickinson he was operating a 1985 Ford Crown Victoria, 4 door sedan, color white, bearing Florida tag 307-EUS, vehicle 6019, his assigned unit for School Security. Naturally, the observations are of great concern to me, since he is supposed to be in a duty satatus at 7:30 a.m., and was supposed to be checking various Duval County School buses for safe driving equipment and student conduct, while the buses are on the roadway. Further, I was quite dismayed to see the two "Activity Reports" submitted by Detective Dickinson for the dates of December 15 and 16, 1986. These reports indicate he was checking buses from 7:30 a.m. to 8:15 a.m., on December 15, 1986, and from 7:30 a.m. to 8:20 a.m., on December 16, 1986, when in fact he was using a vehicle of the Duval County School Board to transport his daughter to her private school. The fact that he included such erroneous information on an official document gives me cause to doubt his veracity and I do not feel he is the type of individual that should be assigned to the School Security Department. Copies of the "Activity Reports" are attached.

In addition, on December 17, 1986, I was in the office when I observed Detective Dickinson walking out of the door. I asked him where he was doing in the office and he replied "paperwork." I also inquired as to his whereabouts earlier in the morning and he responded "Why checking buses like I always do." I then requested that he go to his desk and do the "paperwork" instead of the cafeteria. He walked to his desk and I went into my office. Shortly, I heard him slam the telephone into the cradle. I asked him what the noise was and he said it was the phone and he slammed it down because he was unable to reach his party. I then cautioned him against such rough treatment of the equipment. He immediately put his hand, palm out, toward me as if to warn me away, and he sarcastically commented that I had started the whole thing by

**235**

making comments during a recent School Board meeting that "they" were not cooperating. I told Detective Dickinson that we were not talking about that, but about his rough treatment of the telephone. He responded "Okay, you got it. Whatever you want."

I regard this last incident as a poor reflection upon an experienced law enforcement officer. His conduct and demeanor was antagonistic, rude, and unprofessional. Coupled with his actions on December 15 and 16, 1986, I have concluded that Detective Dickinson is not the type of person that should be representing the School Security Department or working with the student and staff population of the public schools.

I would appreciate your removing him immediately and replacing him as soon as possible.

Mr. Davis had decided to lie in wait across the street from the Jacksonville Country Day School after a neighbor told him the child regularly arrived in a school board vehicle. At hearing Mr. Davis testified that Officer Dickinson's "work was not in question," (T. II. 132) characterizing much of it as "an outstanding and excellent job." *Id.* According to Mr. Davis, Officer Dickinson is intelligent and well-spoken. Officer Dickinson's testimony that he did in fact follow school buses as he drove his daughter to school on December 15 and 16, 1986, was credible and credited.

The transfer was accomplished while Officer Dickinson was away on vacation. He learned about it from his brother who had read of it in the newspaper. With respect to the personal use of school board vehicles, respondent testified that he was "sure that every one of those investigators, including our people who work at night as security officers, have probably used the car to accomplish a personal errand or something of a personal nature." (T. 134) He himself had driven a school board car to his dentist's office and to a barber shop during the work day. With respect to his tonsorial outing, he testified, "[M]y hair grows on the school board time and I don't feel remiss in getting it cut once in a while on school board time." (T. 135) although more recently he had opted for Saturday afternoon haircuts.

By Thomas Nathan Tawes' count, "Mr. Davis . . . used harsh profanity towards," Tawes deposition, p. 9, Mr. Tawes on four occasions. In January of 1985, Mr. Tawes, a school board investigator, ran a red light and caused a traffic accident. The following day Mr. Davis informed him that he had received a report that Mr. Tawes was "drinking prior to the accident and . . . high on drugs," Heard deposition, p. 11, and said

236

"I'm going to have to investigate it. We've got a complaint." And [Tawes] said, "I would like for Captain Heard to be in here, sir." [Davis] said, "No. I'm your goddamn supervisor." [Tawes] said, "Sir, I would like for Captain Heard to be in here." [Davis] said, "You son of a bitch, I'm your goddamn supervisor." [Tawes] said, "Sir, I would like for Captain Heard to be in here." [Davis] said, "Well, then, goddamnit, go get him." Tawes deposition, p. 11.

Mr. Tawes felt he had a right, under a collective bargaining agreement, for his immediate supervisor to be present.

In June of 1985, Mr. Tawes found a note on his desk from Mr. Davis, directing him "to go to a Class 3 hearing," *id.* p. 18, involving a case of alleged sexual battery at Sandalwood High. Mr. Tawes went to Mr. Davis' office and objected to attending, saying he had been excused from such hearings before. In the course of their conversation, Mr. Davis used "goddamn" and "son of a bitch." Tawes deposition, p. 19. Mr. Tawes left Mr. Davis' office and refused to return, even when Mr. Davis said, "Goddamn, I'm sorry. Now get back in my goddamn office." Tawes deposition, p. 20. As Mr. "Tawes stormed out of the office without Mr. Davis' permission," Heard deposition, p. 51, Mr. Heard entered the suite of offices. Mr. Davis told Mr. Heard what had transpired. At Mr. Heard's urging, Mr. Tawes apologized. Heard deposition, pp. 49-50.

Sometime before Christmas of 1985, Mr. Davis swore at Officer Tawes again, in discussing delays Mr. Tawes had encountered in trying to secure an interview with a bus contractor. At an unspecified time during the 1985-1986 school year, Offices Tawes brought Mr. Davis an investigatory report. While he stood in the doorway of Mr. Davis' office, Mr. Davis swore at him and said, "Just go have a seat in your damn office." Tawes deposition, p. 28.

In December of 1986, at Mr. Davis' request, Officer Tawes was transferred back to Jacksonville Sheriff's Office. He gave neither Tawes nor Dickinson any counselling or advance notice of their transfers. Office morale reached its nadir in the wake of these transfers.

## SCHOOL FIRE

On November 28, 1986, Robert E. Lee High School caught fire. Fire alarms failed to sound and nobody at the central monitoring station heard sounds of fire or detected other evidence of fire, even though the fire did "several million dollars worth of damage." (T. I. 159) As one result, the school board hired a former Sonitrol employee, Barrett Miller, to investigate "implementation of the Reston report, the Soni-

trol contract and Underwriters' Laboratory standard as it applied to the public school installations." (T. I. 112, 127)

The Reston report, Respondent's Exhibit No. 5, entitled "School Security Needs Assessment" came into existence "a couple of years before," Heard deposition, p. 52. Mr. Davis began as general director of security, but only came to his attention some time in early 1985 after he had begun. Among numerous other recommendations, the Reston report recommended that:

> The incident reporting system and several other security files should be automated, so that better information is available for feedback to schools and facility planners, as well as for security tactics (e.g., movement of alarms); . . . Respondent's Exhibit No. 5, p. 22.

Although Mr. Davis learned of the report in a conversation with Superintendent Sang, neither Mr. Sang nor anybody else directed him to implement any of the report's recommendations.

When he originally read the automation recommendation, Mr. Davis "didn't know enough . . . about the incident reporting system to know whether . . . [automation] was justified . . ." (T. 37, 38) In January or February of 1987, however, having decided that it was justified, he "requested and received a budget allocation for the acquisition of data base hardware" (T. II. 28) for the purpose. In late 1986, he had discovered problems with manual compilation of the incident reports.

On or about October 10, 1986, Ms. Carlyle furnished Mr. Davis a memorandum she had drafted, styled, "SECURITY DEPARTMENT ACTIVITY REPORT FOR 1985/1986 SCHOOL YEAR," Respondent's Exhibit No. 2, purporting to summarize losses the School Board had sustained from vandalism, theft and arson that year, and offsetting recoveries. In fits and snatches, over the course of a month or six weeks, Mr. Davis checked this draft against incident reports in the office files, the supposed source of the information compiled in the draft. Discovering apparent discrepancies, Mr. Davis mentioned the matter to Superintendent Sang, who directed David E. Wilson, Assistant Superintendent in charge of finance, to cause an audit of the incident reports to be performed to test the draft report's accuracy. The audit confirmed Mr. Davis' suspicions. In order to produce an accurate report, Mr. Davis turned all of the incident reports over to Mr. Wilson's staff, who entered the dates into a computer and generated a report dated January 30, 1987, which the School Board received. The Board had never set a deadline for submission of these reports. In previous year it had been submitted as late as October after the school year ended. (T. II, p. 22)

He assigned Mr. Heard supervision of "officers on their day-to-day investigation." Heard deposition, p. 23. Mr. Heard also "check[ed] employee application records or criminal records for school employees that had been arrested," *id.*, until he received a memorandum dated December 30, 1985, which "restricted [him] to the office." *Id.* The memorandum stated

Effective immediately, you will no longer conduct the record checks for criminal charges or dispositions . . .

Your duty post is in the security offices in the School Board Administration Building . . .

\* \* \*

Should you believe it necessary to leave the building on official business, you should discuss the need with me for approval. Respondent's Exhibit No. 2 to the Heard deposition.

Supervising investigators in the field from his office was "second best," Heard deposition, p. 27. Mr. Heard felt, but he saw the investigators at the end of the work day and took telephone calls from them during the day.

On more than ten occasions while the December 30, 1985 directive was in force, students or others came on school grounds with firearms. Mr. Heard felt he should have been on the scene personally, but he never sought approval to go. Even so, Mr. Heard "c[ould]n't say that it caused any specific loss to the schools," Id., p. 29, his being required. to supervise from the office.

But that was not enough to keep him busy. He found himself spending up to five hours a work day unproductively, reading the newspaper, talking to the clerical staff, and so forth. This idleness was particularly unfortunate in light of the alarm systems that required attention. Mr. Heard was ill part of this time. He missed 50 some working days between January and October of 1986.

## CONCLUSIONS OF LAW

After Superintendent Sang nominated Mr. Davis to fill the position of general director of security for the 1987-1988 school year, in accordance with Section 230.33(7)(a), Florida Statutes (1985), the School Board voted to reject the nomination, in accordance with Section 230.23(5)(a), Florida Statutes (1986 Supp.) which authorizes the School Board to "reject for good cause any employee nominated." The School Board's action rested on material facts respondent Davis

disputed. Substantially affected by nonrenewal of his employment contract, Mr. Davis requested a formal administrative hearing, and the School Board referred the request to the Division of Administrative Hearings, in accordance with Section 120.57(1)(b)3., Florida Statutes (1986 Supp.)

At hearing, respondent Davis contended that the School Board was legally required to renew his contract, once the Superintendent recommended renewal, because his employment contract as a "professional service contract." Section 231.36(3)(a), Florida Statutes (1986 Supp.) He does not reiterate this contention in respondent's proposed findings of fact and conclusions of law, however, and nothing in the record would support this view.

But the Superintendent's nomination "mandates appointment by the Board absent good cause [for rejection.]" *Von Stephens v School Board of Sarasota County,* 338 So.2d 890, 894 (Fla. 3d DCA 1976).

> [A]t the time a nomination is made to the board an implied contract arises between the school district and the nominee. That nomination is final unless the board finds that the nominee is morally or professionally disqualified. *State ex rel. Lawson v Cherry,* [47 So.2d 768 (Fla. 1950)]. *Von Stephens v School Board of Sarasota County,* 338 So.2d at 895.

In *Foreman v Columbia County School Board,* 429 So.2d 383 (Fla. 1st DCA 1983), the First District adopted this rule as its own and made clear the School Board's obligation to demonstrate good cause by competent, substantial evidence. See also *Greene v School Board of Hamilton County,* 444 So.2d 500 (Fla. 1st DCA 1984).

The *Von Stephens* case equates good cause with "failure . . . to meet the criteria of Chapter 231, Fla. Stat." 338 So.2d at 894. At least as regards teachers, the court in *Sherburne v School Board of Suwannee County,* 455 So.2d 1057 (Fla. 1st DCA 1984) adopted the same definition, making particular reference to Section 231.02, Florida Statutes (1985), which requires that appointees be of good moral character.

Chapter 231 provides that members of the district administrative staff may be suspended or dismissed for "immorality, misconduct in office, incompetency, gross insubordination, willful neglect of duty, drunkenness, or conviction of any crime involving moral turpitude." Section 231.36(6)(b), Florida Statutes (1986 Supp.) Proof of one or more of these grounds would establish good cause for the School Board to reject respondent's nomination. *Von Stephens v School Board of Sarasota County,* 334 So.2d 890 (Fla. 2d DCA 1970).

To these grounds, the School Board would add "malfeasance,

240

misfeasance and permanent inability to perform official duties," because Article IV, Section 7(a) of the 1968 Constitution prescribes these as bases upon which the governor can suspend state or county officers. But the cases teach that, for present purposes, the definition of good cause is to be found in Chapter 231, Florida Statutes.

None of the specifications here could conceivably be construed to allege gross insubordination, drunkenness, or commission of a crime involving moral turpitude. In this case, therefore, the School Board must prove immorality, misconduct in office, incompetency or willful neglect of duty. The School Board's burden is to prove one such ground by a preponderance of the evidence. *South Florida Water Management District v Caluwe,* 459 So.2d 390, 394 (Fla. 4th DCA 1984). See *Department of Corrections v Dixon,* 436 So.2d 320 (Fla. 1st DCA 1983); *Florida Department of Health and Rehabilitative Services v Career Service Commission,* 289 So.2d 412 (Fla. 4th DCA 1974).

The evidence fell short of proof of immorality. Official recognition may be taken on the fact that a great many people, even in law enforcement, use swear words. Nobody ever complained to or about Mr. Davis' use of such language, or to anybody in authority, before those charges were brought. If he had been warned not to use such language a different question might have been presented.

## I.

The charge set out in I.A. boils down to a claim that the School Board did not keep its own records "broken down by school and broken down by case" of maintenance calls Sonitrol made, and had to rely on the reports Sonitrol furnished the Board's representatives monthly. Although this was not prudent, the Board did not prove any overpayment to Sonitrol for maintenance resulted. The omission to keep its own maintenance records did not amount to incompetency, misconduct or willful neglect of duty on Mr. Davis' part.

The allegation under the heading I.B. charges Mr. Davis with dereliction on account of the inaccuracies in the draft report of 1985-1986 losses, inaccuracies which he himself brought to his supervisor's attention and eventually succeeded in having corrected. The delay in completion of the report was attributable to the work necessary to correct the report. This work was not done under Mr. Davis' supervision. The delay did not, in any event, cause significant problems for the Board's security operations.

Neither did the delay in automating the record keeping of incident reports, alleged in I.C., amount to incompetency, misconduct or willful

neglect of duty on Mr. Davis' part. Automation would facilitate compilation of these reports but the lack of automation does not preclude expeditious response to information about the state of security any particular incident report contains.

## II.

The evidence did not establish that Mr. Davis prevented Linda Hancock from doing her job. It was on his account that she sought and obtained a transfer. But her transfer does not constitute misconduct, incompetence, or willful neglect of duty on his part.

The Board proved that Mr. Davis wasted Mr. Heard's "productive capacity" in a most unfortunate way by confining him to the office instead of assigning him to supervise installation of Sonitrol systems where he was sorely needed. With a beeper, Mr. Heard could still have been available to investigators needing to reach him by telephone.

It was managerial incompetence, not shorthandedness, that made Mr. Heard idle when work on the Sonitrol system needed doing. Had shorthandedness been the problem, Mr. Davis' failure to fill either of the vacant positions in the department would itself have evidenced incompetence. It was not clear, however, that he was authorized to fill both positions.

Mr. Davis' failure to secure the services of a technical expert in burglar and fire alarm systems was not shown to amount to misconduct, incompetence or willful neglect of duty. The expertise Mr. Heard possessed would have sufficed had it been efficiently utilized.

The evidence showed that Mr. Davis resorted to "verbal profanity and interpersonal abuse" not only in his dealings with Officer Tawes, who seems to have been something of a difficult case, but also in his dealings with the investigators as a group. This heavy-handed approach, exemplified by the summary transfer of Tawes and Dickinson without notice, was demoralizing. In being asked to take charge with the former and still popular chief on the scene, Mr. Davis was given no easy task. But his approach, when he met resistance, not only lacked civility, it proved seriously disruptive and, finally, ineffective. The evidence showed that Mr. Davis did not competently manage the Board's security operations.

## III.

Because unacceptable delays occurred both in rendering newly installed alarm systems operational and in effecting repairs to systems that had once been operational, the allegations in III.A were proven.

242

Whether contract requirements were or were not fulfilled, as alleged in III.B., cannot be determined from a record which does not include the contract.

Under III.E., the Board alleges that Mr. Davis "knowingly authorized payment for services he did not receive from Sonitrol." The evidence wholly failed to support this allegations.

### *RECOMMENDATION*

Upon consideration of the foregoing, it is

RECOMMENDED:

That the School Board reject the Superintendent's nomination of Respondent Richard M. Davis as General Director of Security.

DONE and ENTERED this 27th day of January, 1988, in Tallahassee, Florida.